E-FILED
Thursday, 22 April, 2010  03:36:31 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| THOMAS G. CALLAHAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  09-3135 |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

JEANNE E. SCOTT, U.S. District Judge:

Plaintiff Thomas G. Callahan appeals the denial of his application for disability insurance benefits and supplemental security income (collectively Disability Benefits) under the Social Security Act.  42 U.S.C. §§ 405(g) & 1383(c)(3).  The parties have filed cross motions for summary judgment. For the reasons set forth below, the Defendant Commissioner's Motion for Summary Affirmance (d/e 12) is ALLOWED, and Plaintiff Callahan's Motion for Summary Judgment (d/e 10) is DENIED.  The Decision of the Commissioner is affirmed.

<u>STATEMENT OF FACTS</u>

Callahan was born on August 27, 1955.  He has a sixth grade education.  He previously performed work as a machinist, a loader/operator, a convertible top installer, a meat grinder, a cashier, a plastic molding machine tender, and a cable installer.  Callahan suffered from back problems and related leg pain, and also, shoulder problems.  On March 2, 2006, Callahan went to the emergency room because he injured his back while trying to help his mother.  The emergency room physician diagnosed a thoracic lumbar sacral strain and prescribed pain medication.  <u>Answer (d/e 7)</u>, attached <u>Certified Record of Proceedings before the Social Security Administration (R.)</u>, 284-85.  On March 6, 2006, Callahan went to see Daniel Lanzotti, M.D., because the back pain persisted.  Dr. Lanzotti found straight leg testing was positive on the right.  <u>R.</u> 338.  Dr. Lanzotti diagnosed back pain with radiculopathy and stress of life.

Callahan continued to have problems with back pain.  Callahan went back to the emergency room on May 5, 2006, with intractable back pain.  <u>R.</u> 244.  He was given toradol, norflex, and dilaudid and released.  <u>R.</u> 245.  On May 10, 2006, he saw Dr. Lanzotti.  Dr. Lanzotti found straight leg testing mildly positive on the right.  Dr. Lanzotti ordered an MRI of

Callahan's LS spine area.  R. 335.  The MRI showed a small broad-based posterior L5-S1 disc protrusion without significant mass effect on the thecal sac, and mild lower lumbar spine degenerative facet disease.  R. 242.

Callahan saw Stephen Pineda, M.D, on June 13, 2006.  After reviewing the MRI results and examining Callahan, Dr. Pineda ordered epidural injections for the pain.  R. 332.  On June 19, 2006, Callahan saw Dr. Gary Western for the epidural injections.  Dr. Western diagnosed a degenerative disc disease at L4-5, L5-S1.  He prescribed physical therapy and arranged for the epidural injections.  R. 330-31.

Callahan applied for Disability Benefits on June 27, 2006.  He alleged that he became disabled on December 31, 2004.

On July 3, 2006, Callahan returned to see Dr. Pineda because the epidural injections were not effective.  Dr. Pineda ordered another MRI of Callahan's back.  The MRI was performed on July 7, 2006.  The MRI showed a node at the endplate of L4, a mild defuse disc bulge at the L5-S1 disc, and mild bilateral facet hypertrophy.  R. 240.  Callahan also went to physical therapy on July 7, 2006.  The therapist noted that Callahan had an abnormal gait and used a cane.  The therapist noted positive testing and difficulty performing activities involving back movement.  R. 326-27.

Dr. Lanzotti examined Callahan again on July 19, 2006.  R. 334.  Dr. Lanzotti noted that Callahan walked with a cane and had muscle tightness in his back.  R. 334.  Dr. Lanzotti noted that Callahan underwent epidural injections without relief.  R. 334.  Dr. Lanzotti noted mildly positive straight leg testing on the right.  R. 334.

A state agency physician, Vittal Chapa, M.D., performed a consultative examination on September 6, 2006.  R. 343-45.  Dr. Chapa noted that an MRI showed a small herniated disc.  Dr. Chapa noted that Callahan walked with a cane.  He opined that Callahan could walk 50 feet without a cane, but could not heel or toe walk, and had an antalgic gait.  Dr. Chapa noted positive straight leg testing on both sides and missing ankle reflexes.  He concluded that Callahan had lumbar radiculopathy, but could walk short distances without a cane.  R. 345.

Callahan went to see Per Freitag, M.D., on July 26, 2007.  Dr. Freitag noted that Callahan had discomfort walking and an antalgic gait.  Dr. Freitag suspected that Callahan had lumbar radiculopathy and ordered EMG tests and prescribed a back brace.  R. 396.  The EMG tests were negative.  R. 395.  Dr. Freitag saw Callahan again on September 4, 2007.  At that time, he noted weakness in Callahan's left ankle and toe

dorsiflexion.  R. 394.

On September 13, 2006, Charles Kenney, M.D., reviewed the medical record and prepared a physical residual functional capacity assessment.  R. 383-90.  He opined that Callahan could walk for 6 hours in an 8-hour day, could lift and carry 20 pounds occasionally and 10 pounds frequently, could use foot controls without restrictions, and could occasionally climb ladders, scaffolds and ropes.  R. 383-85.

Callahan saw Dr. Freitag again on October 18, 2007.  At that time, Dr. Freitag determined that Callahan's pain was probably discogenic.  Dr. Freitag ordered a discogram.  The discogram was positive for reproduction of concordant pain at the L5-S1 disc.  R. 400-01.

On November 7, 2006, Dr. Lanzotti examined Callahan.  He found positive straight leg testing on the left and noted paralumbar spinous muscle spasms.  R. 355.  On November 28, 2007, Callahan saw Ferdinand Salvacion, M.D., at the Memorial Medical Center Pain Clinic.  Dr. Salvacion prescribed methadone and norco for the pain.  R. 402.  Callahan saw Dr. Freitag again on December 11, 2007.  Dr. Freitag scheduled an IDET procedure to reduce the pain.  R. 458.  Dr. Freitag performed the IDET procedure on February 15, 2008.  At a follow-up visit on March 26,

2008, Callahan indicated his pain was not affected by the procedure.  <u>R.</u>
449.

Callahan developed shoulder problems in August 2007, after he tried
to sand some wood.  <u>R.</u> 421.  Callahan underwent an MRI of his shoulder
on September 5, 2007.  Callahan was referred to Brett Wolters, M.D.  Dr.
Wolters noted that the MRI showed a rotator cuff tear, tendon tears, a
partially subfluxed biceps tendon, and AC joint arthritis.  <u>R.</u> 420.  Callahan
received cortisone injections and underwent physical therapy.  He showed
improvement, but the pain remained significant.  <u>R.</u> 523.  On March 27,
2008, Callahan underwent arthroscopic surgery to repair the biceps tendon,
to decompress the subacromial area, and to excise the distal clavicle.  <u>R.</u>
494-95.

The Administrative Law Judge held the first hearing in this case on
April 23, 2008.  Callahan and his attorney were present, along with
vocational expert Ron Malik.  Callahan testified that he had significant back
pain and neck pain.  He stated that the pain medication helped somewhat.
He said that he had good days and bad days.  <u>R.</u> 643.  The medication gave
him a sleepy, tired feeling.  <u>R.</u> 644.  Callahan testified that he had trouble
sitting or standing for extended periods.  He said that he could sit or stand

for about 25 minutes at a time. He said that he could walk less than a quarter mile at a time. On a good day, he said he could alternate between sitting and standing for about an hour and a half before he needed to lie down. R. 646. On a bad day, he would need to lie down after 20 minutes. R. 646. He could not lift a gallon of milk with his right hand. He could lift a gallon of milk with his left hand, but could not carry the gallon any distance. R. 646. The back pain kept him from lifting and carrying. R. 647. The recent shoulder surgery affected his ability to use his right arm. R. 646.

Callahan lived with his two children, ages 10 and 15. He cooked meals for the three of them using a microwave oven. He also did laundry, washed dishes, and shopped for groceries. R. 650. He did not make beds or vacuum floors. R. 650. He said that he had problems reaching straight out from his body. R. 652. He said that moving exacerbated the pain. R. 653. The pain affected his sleep. He would wake up every thirty minutes and change positions because of the pain. R. 653. He was wearing a back brace at the hearing. R. 655. He testified that routine daily activities took long periods of time because he had to work for short periods and then lie down to rest. Washing breakfast dishes, for example, could take an hour

because he would wash a few dishes, lie down and rest, and then repeat the process.  R. 657.  He estimated that he spent 80 percent of his time lying down or sitting in a recliner.  R. 657.

The ALJ asked Callahan about his employment in 2004.   His employment history showed that he earned $2,321.15 in 2004.  R. 133. Callahan testified that he earned that money as a temporary worker on contract at a plastic injection molding company.  Callahan took finished parts out of the molding machines.  R. 642.  He testified that he worked at that job for "[m]aybe a month and a half, two months I think."  R. 642.  He said the job ended because the contract ran out.  R. 642.

Vocational expert Malik then testified.  Malik testified that the report on Callahan's employment history should be corrected.  The job of cable installer should be changed to horizontal boring machine operator and the job of injection molding machine tender (Tender) should be added.  R. 659. The Tender job was unskilled, light exertional work.  R. 659.

The ALJ and Malik had the following colloquy:

Q.    I'd like you to assume we have an individual the same age, education and experience as the Claimant.  This individual is limited to medium work with occasional ropes, ladders and scaffolds.  How would these restrictions affect the performance of Claimant's past relevant work?

A.    Based upon that I think, Your Honor, the Claimant could return to all past work.

Q.    If we reduce the exertional level to light and limit it to moderately complex detailed tasks how would that affect past relevant work?

A.    Based upon that hypothetical the Claimant could return to the past job of cashier and the injection molding machine tender.

Q.    If the last hypothetical we had that the individual was also limited to overhead reaching with the dominant arm to occasional how will that affect the Claimant's past relevant work?

A.    That would not -- well that would eliminate the medium, Your Honor, but it would allow the performance of the cashier and injection molding machine tender position.

R. 659-60.  The ALJ concluded the hearing after Malik's testimony.

On April 28, 2008, Callahan went to the emergency room after hurting his shoulder and back while driving.  R. 528.  He saw Dr. Wolters for a follow-up examination on May 2, 2008.  R. 551.  Dr. Wolters had his shoulder x-rayed.  The x-rays showed only post-operative changes.  R. 554.

The ALJ issued his initial decision on May 19, 2008.  R. 38-48.  The ALJ found that Callahan was not disabled because he could return to his prior work as a cashier and Tender.  R. 47.  On May 22, 2008, Callahan appealed the Decision to the Social Security Administration Appeals

9

Council.  R. 96.

On June 3, 2008, Callahan saw Dr. Wolters again.  Callahan's right shoulder had a passive range of motion of 180 degrees, and external rotation of 30 degrees.  Dr. Wolters found full neurological function in the right upper extremity.  Callahan still had significant pain.  Dr. Wolters gave him another cortisone shot.  He did not give him other pain medication because he was "maxed out his pain medicine dosage" due to his back pain.  R. 550.

On June 30, 2008, the Appeals Council remanded the case to the ALJ for further proceedings.  R. 51-53.  The Appeals Council determined that the ALJ had not considered the evidence that Callahan suffered from discogenic pain, and had not considered all of the evidence regarding Callahan's residual functional capacity (RFC) and credibility.  R. 52.  The Appeals Council also stated that the ALJ needed to elicit additional expert testimony regarding the finding that Callahan's work as a cashier and Tender constituted substantial gainful activity.  The Appeals Council stated that the record indicated that Callahan engaged in substantial gainful activity in 1996 and 1998 to 2000, but he did not work at these two jobs during these time periods.  R. 52.  The Appeals Council directed the ALJ to consider these matters on remand.  R. 53.

During this period, Callahan continued to see his doctors regarding his pain. Dr. Freitag ultimately recommended back surgery to replace his L5-S1 disc with an artificial disc. On October 1, 2008, Callahan underwent the recommended procedure. R. 592-93. On October 7, 2008, Callahan called Dr. Freitag's office because he was having trouble walking with a cane. He wanted to know if he could use a walker. Dr. Freitag responded that he should not use a walker because a person tends to bend over slightly when using a walker. Dr. Freitag stated that Callahan should not bend, twist, or lift at this time. R. 580.

Callahan saw Dr. Freitag on October 9, 2008, for a post-operative check. Callahan was wearing a corset brace. Dr. Freitag noted that Callahan's gait improved, he appeared to be in no distress, and he had good strength in bilateral lower extremities. R. 578. Dr. Freitag also noted that the implant was in good position and showed no signs of rejection. R. 578.

The ALJ held the second hearing in this case on October 28, 2008. Callahan and his attorney again appeared. Vocational expert Malik was also present, but did not testify. Callahan testified that he was recovering from his recent back surgery. He said that it felt like a Mack Truck was sitting on his back all the time. R. 622. He did not know at this point how long

11

his recovery from the surgery would take.  R. 621-23.  He testified that there had been no change in his daily activities.  R. 625.  He testified that he still spent most of his time lying down or in a recliner.  R. 625-26.  Callahan was using a cane at the hearing.  He testified that he did not use the cane every day because of the strain it put on his shoulder.  R. 623.  The ALJ noted that Callahan did not use a cane at the April 23, 2008, hearing, or mention that he used a cane to walk.  Callahan testified that he did not use the cane at the first hearing because it was an off day to use the cane.  R. 628.  Callahan testified that he was still wearing a back brace.  The brace restricted his movement and pinched.  R. 623.

The ALJ issued his second Decision on December 11, 2008.  The ALJ followed the five-step analysis set forth in the Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education, and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).

Such severe impairments are set forth in the an appendix to the regulations referred to as the Listings.  20 C.F.R. Part 404 Subpart P, Appendix 1.  The claimant's condition must meet the criteria in a Listing or be equal to the criteria in a Listing.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the ALJ to determine whether the claimant is able to return to his past relevant work considering his RFC.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f). The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ determined that Callahan met his burden at Steps 1 and 2. He determined that Callahan was not engaged in substantial gainful activity and had severe impairment due to degenerative disc disease and post right

shoulder arthroscopy.  <u>R.</u> 23.  At Step 3, the ALJ determined that Callahan's condition was not severe enough to be equal to any Listing.  <u>R.</u> 24.

At Step 4, the ALJ determined that Callahan had the RFC to perform light work limited to work of moderate complexity and only occasional reaching with the dominant arm.  <u>R.</u> 24.  In making this finding, the ALJ determined that Callahan's testimony regarding the severity of his limitations was not credible.  The ALJ noted that Callahan raised two children, prepared meals, washed dishes and laundry, shopped for groceries, and handled the family finances.  Callahan also stated that his job in 2004 ended because the contract ended and that, but for that fact, he would have continued working at that job.  The ALJ found that this level of activity was inconsistent with Callahan's claim that he lay down 80 percent of time.  <u>R.</u> 25-26.

The ALJ also determined that the claimed severity of Callahan's symptoms was not consistent with the medical record.  <u>R.</u> 26.  The ALJ reviewed the medical evidence and noted the test results showing a disc bulge at the L5-S1, but no evidence of radiculopathy.  The ALJ summarized the evidence of discogenic pain.  The ALJ reviewed the shoulder and back surgeries and the post-operative notes.  <u>R.</u> 26-30.  The ALJ noted that no

14

doctor put any restrictions on Callahan's activities. The ALJ concluded that the medical evidence did not support Callahan's claims that his condition was disabling. The ALJ, stated, however:

> Despite the lack of abnormal clinical findings or physician restrictions in the record, the undersigned will give the claimant the benefit of the doubt in finding that his alleged pain in conjunction with his other impairments discussed herein has limited him in a manner consistent with the adopted residual functional capacity findings made in this decision.

R. 30. The ALJ then found that Callahan could do his prior relevant work as a cashier or Tender. The ALJ then concluded at Step 4 that Callahan was not disabled. R. 31. Callahan appealed to the Appeals Council. On April 2, 2009, the Appeals Council denied his request for review. R. 5. Callahan then filed this action.

## ANALYSIS

Callahan raises three issues on appeal: (1) the ALJ's credibility determination is unsupported by substantial evidence; (2) the ALJ's RFC determination is unsupported by substantial evidence; and (3) the ALJ erred at Step 4 because the cashier and Tender positions were not relevant work.

This Court reviews the ALJ's Decision to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant

evidence as a reasonable mind might accept as adequate" to support the decision.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  This Court must accept the ALJ's findings if they are supported by substantial evidence, and may not substitute its judgment for that of the ALJ.  <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ further must articulate at least minimally his analysis of all relevant evidence.  <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence.  <u>Diaz v. Chater</u>, 55 F.3d 300, 308 (7th Cir. 1995).

The ALJ's credibility finding is supported by substantial evidence. Callahan testified that he must lie down or recline 80 percent of the time and must perform tasks in short intervals.  Yet, he testified that he regularly shopped for groceries.  The ALJ could conclude that Callahan did not lie down every ten minutes during his trip to the grocery store.  This evidence supported the finding that Callahan's claim that he must lie down 80 percent of the time and break tasks up is not credible.  Callahan also testified that he did the laundry for himself and his two children.  The ALJ could conclude from this testimony that Callahan could lift and move wet laundry and could lift and carry dry laundry.  The ALJ could conclude that

this testimony was inconsistent with Callahan's testimony about his inability to lift and carry.  Callahan also did not use a cane, or mention the use of a cane, at the first hearing.  This evidence supported the conclusion that Callahan's need for the assistance of a cane was less than he claimed. Given the existence of this evidence, the Court will not disturb the ALJ's credibility determination.

The ALJ's determination of Callahan's RFC is also supported by substantial evidence.  Dr. Kenney's RFC assessment supports the ALJ's conclusion that Callahan could perform light work with restrictions on reaching with the dominant arm.  The objective medical evidence shows positive straight leg testing, some muscle spasms, and discogenic pain from a degenerative L5-S1 disc in his back, and tears and impingements in his shoulder.  The objective evidence supports the conclusion that the shoulder problems were corrected surgically.  The objective medical evidence, by itself, does not indicate the degree to which the discogenic pain and the post-operative condition of Callahan's shoulder limit his functional capacity. The only evidence regarding the degree to which these conditions limit Callahan's functional capacity was Callahan's subjective reports of pain. The ALJ determined that Callahan exaggerated the degree to which his pain

limited his activities.  As explained above, the Court will not disturb that credibility finding.  In addition, no treating physician placed any restrictions on Callahan's activities, other than temporary post-operative restrictions. Also, Dr. Freitag's examination after the October 2008 back surgery showed that Callahan's gait had improved, he appeared to be in no distress, and he had good strength in both of his lower extremities.  All of this evidence supports the ALJ's determination that Callahan's condition is not as debilitating as he claims, and that he has the RFC to perform work at the light exertional level subject to the limitations set by the ALJ.

Finally, the ALJ did not err in finding that Callahan's work as a Tender constituted past relevant work.  Callahan does not dispute the vocational expert's opinion that a person who is the same age as Callahan, who has the same education and work experience as Callahan, and who has the RFC determined by the ALJ, could perform Tender and cashier jobs. Callahan only disputes that his work as a cashier and Tender constituted past relevant work for purposes of Step 4 of the Analysis.  The Commissioner apparently concedes that the cashier job is not past relevant work.  The Commissioner, however, argues that this error was harmless because the Tender job was past relevant work, and the issue at Step 4 is

whether Callahan can return to any past relevant work.  The Court agrees with the Commissioner.

To constitute past relevant work at Step 4, the person must perform the work long enough to learn how to do the job, and the person must perform the work at the level of substantial gainful activity.  20 C.F.R. § 404.1565.  Callahan testified that he performed the Tender job for a month and a half to two months.  According to the Dictionary of Occupational Titles (DOT), the Tender job is unskilled and has a Specific Vocational Preparation (SVP) level of 2.  DOT, § 556.685-038, at www.aolj.dol.gov/libdot.htm, visited April 13, 2010.  A job with an SVP level of 2 can be learned in a month or less.  DOT, Appendix C.  The record, thus, contains substantial evidence that Callahan worked the Tender job long enough to learn how to do the job.  The Commission regulations state that an activity is presumed to be substantial gainful activity if, in 2001, the person earned $700 a month at the task.  20 C.F.R. § 404.1574(b)(2)(ii)(B).  The regulations provide that the Commission is to adjust the $700 based on increases in the national wage index.  Id.  The Commission has calculated that in 2004, an activity is presumed to be substantial gainful activity if the person earned $810 a month at the task.

Programs   Operations   Manual   System, DI   10501.015,   at
https://s044a90.ssa.gov/apps10/poms.nsf/partlist!OpenView, visited April
13, 2010.  Callahan earned $2,321.15 for, at most, two months' work as a
Tender.  This constitutes substantial evidence that Callahan worked the
Tender job at the substantial gainful activity level.  The ALJ, thus, did not
err in finding that the Tender job was past relevant work at Step 4.  The
vocational expert's opinion supported the ALJ's determination that Callahan
was not disabled at Step 4 of the Analysis because he could return to his
past relevant work.

Callahan argues that the Appeals Council stated that Callahan did not
perform the job at the level of substantial gainful activity.  Callahan cites no
authority for the proposition that the Appeals Council's observation was
controlling on the ALJ, this Court, or even itself.  On remand, the ALJ again
found that the Tender job was past relevant work, and the Appeals Council
denied review the second time.  The Appeals Council was not bound by its
own observation on the first appeal.  This Court is also not bound.
Substantial evidence exists to support the finding that Callahan worked as
a Tender at the level of substantial gainful activity and long enough to learn
how to do the job.  The ALJ did not err in finding the Tender job was past

relevant work at Step 4.  There was no reversible error.

THEREFORE, Defendant Commissioner's Motion for Summary Affirmance (d/e 12) is ALLOWED, and Plaintiff Callahan's Motion for Summary Judgment (d/e 10) is DENIED.   The Decision of the Commissioner is affirmed.  All pending motions are denied as moot.  This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:   April 22, 2010

FOR THE COURT:

_____ s/  Jeanne E. Scott _____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE